IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DONALD SCHALLER, | ) | CASE NO.  8:06CV276 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| McDERMOTT & MILLER, P.C. | ) | |
| EMPLOYEES PENSION PLAN; | ) | |
| McDERMOTT & MILLER, P.C.; | ) | |
| BRADLEY L. FEGLEY, Administrator and | ) | MEMORANDUM & ORDER |
| Trustee; MICHAEL A. WALENZ, | ) | |
| Administrator and Trustee; THOMAS B. | ) | |
| KRUGER, Administrator and Trustee; | ) | |
| THOMAS G. KRUGER, Administrator | ) | |
| and Trustee; RUSSELL H. | ) | |
| LOEWENSTEIN, Administrator and | ) | |
| Trustee; and DAVID J. FAIMON, | ) | |
| Administrator and Trustee, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the Defendants' Motion for Summary Judgment (Filing No. 31).  Plaintiff Donald Schaller filed his Complaint against the Defendants, the McDermott & Miller, P.C., Employees Pension Plan (hereafter the "Plan"), McDermott & Miller, P.C., and the Plan's Administrators and Trustees Michael A. Walenz, Bradley L. Fegley, Thomas B. Kruger, Thomas G. Kruger, Russell H. Loewenstein, and David J. Faimon (hereafter "Administrators").  In his Complaint, Schaller alleges that the Defendants have denied him pension plan benefits and have breached their fiduciary duties to him in violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1101-1114, specifically §§1104 and 1132 (hereafter "ERISA").  The matter has been briefed, and the parties have submitted evidence in support of their respective positions.

## Background[1]

Defendant McDermott & Miller, P.C., is an accounting firm and was, at all material times, Plaintiff Donald Schaller's employer. Schaller stopped working for McDermott & Miller in February 2004. Defendant McDermott & Miller, P.C., Employees Pension Plan (hereafter the "Plan") is a pension plan established pursuant to a Defined Benefit Plan and Trust Agreement effective March 1, 1984. McDermott & Miller is a fiduciary with respect to the Plan because it has the authority to appoint and remove the Plan's trustees and administrators, and because it exercises discretionary authority with regard to the Plan's management and administration and within the meaning of the ERISA. The individual defendants, Bradley L. Fegley, Michael A. Walenz, Thomas G. Kruger, Russell H. Loewenstein, and David J. Faimon, are shareholders of McDermott & Miller, and they act as Plan fiduciaries in their roles as Plan Trustees and Plan Administrators.

Schaller was born on February 7, 1942. (Filing No. 34, hereafter "Schaller Dep." 40:14-16). He became an employee of McDermott & Miller on or about January 1, 1979;

---

[1] The form of the Defendant's brief, specifically the statement of facts, does not comply with the local rules of the Court. Counsel is advised to comply with the rule in the future or risk denial of motions based on noncompliance. NECivR56.1 describes the moving party's requirements as to form.

(a)(2) Form; Citation to Record. The statement of facts shall consist of **short numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials relied upon to support the material facts recited in the paragraph.** A fact is "material" if pertinent to the outcome of the issues identified in the motion for summary judgment. The statement of facts shall describe the parties and recite all facts supporting the court's venue and jurisdiction. The statement shall not contain legal conclusions. Failure to provide citations to the exact locations in the record supporting the factual allegations shall be grounds to deny the motion.

began participating in the Plan on or about March 1, 1984; and retired from McDermott & Miller effective February 7, 2004, at the age of 62. (Complaint ¶¶ 13 and 14; Answer ¶ 6).

Schaller provided some background to the shareholders' adoption of the Plan. He stated that the McDermott & Miller shareholders wanted to improve the management of shareholder buyout prices because the buyouts were getting too costly, and wanted to find a way to fund some of the buyout. For those reasons, the shareholders adopted the Plan, lowered the buyout price, and agreed on the lump-sum distribution option in the Plan, which was intended to make up for the lowering of the buyout price. (Schaller Dep. 42).

On or about August 10, 2000, McDermott & Miller by its then managing partner, Jerry Colvert, executed a Supplemental Executive Retirement Plan ("SERP") with Schaller. (Tr. Ex. 19). Schaller explained that he executed the SERP with McDermott & Miller because the shareholders "wanted to amend the plan because it was underfunded, . . . and one of the things [the amendment] was going to do was to reduce my retirement benefits under the plan, at least more than anybody else's, so they signed the agreement so that if I quit they would make up the difference." (Schaller Dep. at 46). The SERP is self-described as an unfunded supplemental retirement plan, that sets forth a minimum level lump sum pension benefit payable to Schaller if he retired after age 60 and before age 62. Schaller believed the purpose and intent of the SERP was to guarantee him a minimum lump sum benefit upon his retirement in the event the Plan was underfunded at the time of his retirement. (Filing No. 30, Affidavit of Michael Walenz at Exhibit 1,

3

Transcript from Schaller Appeal Hearing at 11:16 -12:11 and Transcript Exhibit 9; Filing No. 34, Schaller Dep. 46-47).[2]

The Plan is to be funded at 110 percent of the Plan's liabilities.  When the assets of the McDermott & Miller Plan are less than 110 percent of the current liabilities, the lump sum payments otherwise allowable under the Plan are limited for Restricted Employees. There is evidence that the Plan has been undervalued at least since 2003.  Effective June 22, 2003, the Pension Plan was frozen so that no additional employees would become participants and the accrued benefit of any participant would not increase.  (Tr.  Ex. 10, 11).

Thereafter, Schaller discussed his retirement options verbally and in writing with shareholders and Trustees, including Mike Walenz.  (Tr. 10:25-11:15, 12:12-13:4; Filing No. 34, Schaller Dep. 31:6-32:6, 34:16-35:1, 43:3-11, 44:17- 24).  At the time, Walenz was the President of McDermott & Miller and a Trustee and Plan Administrator.  Schaller maintains that before and during 2003, Walenz and other Trustees told him that the Plan would make a lump-sum distribution to Schaller upon his retirement from the firm.  (Tr. 10:25 - 11:15, 12:12-13:4; Schaller Dep. 31:6-32:6, 34:16-35:1, 43:3-11, 44:17-24; Exs. 1 and 3).  Schaller also has stated that at nearly every McDermott & Miller shareholders' meeting, there had been a presentation of the value of each shareholder's lump-sum distribution as of the meeting date based on age and time of service.  Schaller was not aware of any discussion among the shareholders that Plan's Restricted Employees would

---

[2] The transcript of the hearing and the exhibits offered at the hearing will be referred to hereafter by reference to the transcript (identified hereafter as "Tr." and page or exhibit number).

4

not be entitled to a lump-sum distribution (though he concedes he did not attend the shareholders' meeting in January 2004.)  (Schaller Dep. 44).

On June 16, 2003, Schaller submitted a written request for information relative to his retirement benefit and payment options to Walenz.  (Tr. Ex. 1).  In response to this inquiry, Schaller received a copy of a letter date July 17, 2003, by Gregg Rueschhoff, an employee of Milliman USA and the Plan's consulting actuary.  In the letter, Rueschhoff set forth Schaller's options upon retirement under the existing Plan and he identified possible amendments to the Plan.  One of Schaller's options that was identified in that letter was to obtain a lump-sum distribution of his benefits, assuming that one of the three security options was satisfied by Schaller as set out in Section 5.20 (d) of the plan.  Rueschhoff expressly stated to Walenz that Schaller had the right to elect a lump-sum option for payment of his benefit upon retirement even though Schaller was a Restricted Employee as defined in the Plan, and the Plan was funded at less than 110%. (Tr.  Ex. 2).  If this representation was seen as incorrect by Walenz, there is no evidence before the Court that Walenz attempted to correct it.

In a letter dated September 24, 2003, and in response to a second inquiry by Schaller regarding his lump-sum distribution value, Walenz provided Schaller with estimated lump-sum distribution values using both 5.5 and 6.0 interest rates.  Walenz based his calculation on the actuarial report dated March 1, 2003. (Tr. Ex. 3).

During the January 6, 2004, McDermott & Miller Shareholder's meeting, there was some discussion about the underfunded status of the Plan and the potential long term benefits to amending the Plan.  Although  no formal amendments were proposed at the meeting, discussion included increasing the retirement age of Plan participants and

5

considering whether lump-sum distributions could be segregated prior to the Plan being fully funded. (Filing No. 30, Walenz Aff. Ex. 2).

On February 7, 2004, Schaller turned 62 years old, and pursuant to the SERP, it was the final day that the SERP arguably was in effect. On that date, Schaller sent written notice of his retirement, effective that same day, to Walenz and the Board of Directors. In the letter, Schaller also provided notice that he intended to enforce the SERP and that he intended to exercise the option to obtain a lump-sum distribution. Schaller stated that he was prepared to provide the bank letter of credit if the Plan was underfunded, and that he only needed to know from them the amount it should cover. (Tr. Ex. 4).

In March 2004, McDermott & Miller obtained an actuarial valuation report that confirmed the underfunded status of the Plan. On May 27, 2004, the Plan's Trustees had a meeting, for which formal notice was waived, and during which they unanimously voted that in their capacities as Plan Administrators, they would deny requests for lump-sum distributions made by former and current highly compensated employees. (Tr. Ex. 12). A month later, the Trustees' vote was approved by the McDermott & Miller Board of Directors.

On June 1, 2004, Walenz sent Schaller an Application for Benefit Distribution Form that did not contain an option for a lump-sum distribution. (Tr. Ex. 5). Walenz explained in that correspondence that the form was designed for former employees who qualified as Restricted Employees under the Plan, and that the form did not include a lump-sum distribution option because that option was no longer available under the Plan, except in the Plan Administrators' discretion, and that "significant other legal requirements would need to be met" in order to receive a lump-sum distribution. (Tr. Ex. 5). On July 7, 2004,

6

the Plan's attorney provided Schaller with an explanation of the Plan provisions that, in his opinion, permitted the Plan Administrator to exercise discretion to deny Schaller's lump-sum distribution request. (Tr. Ex. 6).

On February 24, 2005, Schaller sent correspondence to the Plan Administrator in which he made a formal request for the lump-sum distribution, returned the unexecuted Application for Benefit Distribution Form, and requested several Plan-related documents. Schaller notified the Plan of his intention to deliver a bank letter of credit equal to the restricted amount of the lump-sum distribution. (Tr. Ex. 7). On April 11, 2005, the Plan Administrator denied Schaller's application for a lump-sum distribution of his benefits. (Tr. Ex. 8). Schaller timely submitted a request for hearing in regard to the denial of his request for benefits under the Plan. (Tr. Ex. 9). On September 19, 2005, following the August 2005 hearing, the Plan Administrator denied Schaller's appeal. (Walenz Affidavit Exhibit C).

Transcript Exhibits 17 and 18 appear to amend the Plan retroactive to March 1, 2004, to permit a one-time lump-sum distribution for highly compensated employees when the underfunded status of the plan abates. Transcript Exhibit 25 also appears to show that the retirement date for Schaller, that McDermott & Miller recognizes, is February 7, 2007, when Schaller would have reached age 65.

**Pertinent Provisions of the Plan**

Consistent with the requirements of ERISA, the Plan provides that McDermott & Miller shall "insure that the Plan is being operated for the exclusive benefit of the Participants and their Beneficiaries in accordance with the terms of the Plan, the Code, and the Act." The Plan vests the authority to appoint counsel, specialists, advisors, agents

7

(including any non-fiduciary agent) and other persons as the Employer deems necessary or desirable in connection with the exercise of its fiduciary duties under this Plan." Significantly, the Plan gives discretionary authority to the Plan Administrator "to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan."   The Plan explains the discretionary nature of the Administrator's authority:

> The Administrator may establish procedures, correct any defect, supply any information or reconcile any inconsistency in such manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the Plan; provided, however, that any procedure, discretionary act, interpretation or construction shall be done in a non-discriminatory manner based upon uniform principals consistently applied

(Tr. Ex. 30, Section 2.4; Complaint ¶ 11; Answer ¶ 4).

Other material provisions of the Plan include the following:

5.9 TERMINATION OF EMPLOYMENT BEFORE RETIREMENT

(a)     Payment to a Former Participant of the Vested Portion of the Accrued Benefit, unless the Former Participant otherwise elects, shall begin not later than the sixtieth day after the close of the Plan Year in which the latest of the following events occurs: (1) the date on which the Participant attains the earlier of the age 65 or the Normal Retirement Age specified herein; (2) the tenth anniversary of the year in which the Participant commenced participation in the Plan; or (3) the date the participant terminates service with the Employer.

5.10   DISTRIBUTION OF BENEFITS

(a)     (1)     . . . . [A]n unmarried Participant shall receive the value of such Participant's benefit in the form of a life annuity. Such unmarried Participant, however, may elect to waive the life annuity. The election must comply with the provisions of this Section as if it were an election to waive the Joint and Survivor Annuity by a married Participant, but without fulfilling the spousal consent requirement. . .

(2)     Any election to waive the Joint and Survivor Annuity must be made by the Participant in writing (or in such other form as permitted by the IRS) during the election period and be consented to in writing (or in such other form as permitted by the IRS) by the Participant's spouse.

. . . . .

(5)     With regard to the election, except as otherwise provided herein, the Administrator shall provide to the Participant no less than thirty (30) days and no more than ninety (90) days before the Annuity Starting Date a written (or such other form as permitted by the IRS) GAP explanation of:

(i)     the terms and conditions of the joint and survivor annuity,

(ii)    the Participant's right to make and the affect of an election to waive the Joint and Survivor Annuity,

(iii)   the right of the Participant's spouse to consent to any election to waive the Joint and Survivor Annuity, and

(iv)    the right of the Participant to revoke such election, and the effect of such revocation.

. . .

(b)     In the event a married Participant duly elects pursuant to paragraph (a)(2) above not to receive the benefit in the form of a Joint and Survivor Annuity, or if such Participant is not married, in the form of a life annuity, the Administrator, pursuant to the election of the Participant, shall direct the distribution to a Participant or Beneficiary of an amount which is the Actuarial Equivalent of the retirement benefit provided in Section 5.1 in one or more of the following methods which are permitted pursuant to the elections made in the Form of Distributions Section of the Adoption Agreement:

(1)     One lump-sum payment in cash or in property. . .

*   *   *

5.20    LIMITATION OF BENEFITS ON TERMINATION

(a)     Benefits distributed to any "Restricted Employee" are restricted such that the payments are no greater than an amount equal to the payment that would be made on behalf of such individual under a Straight Life Annuity that is the Actuarial Equivalent of the sum of the individuals Accrued Benefit, the individuals other benefits under the Plan (other than a social security supplement within the meaning of Regulation 1.411(a)-7)(c)(4)(ii)), and the amount the individual is entitled to  receive under a social security supplement. However, the limitation of this Section shall not apply if:

9

(1)     after payment of the benefit to an individual described above, the value of the Plan assets equals or exceeds One-hundred ten percent (110%) of the value of current liabilities, as defined in Code Section 412(1)(7);

(2)     the value of the benefits for an individual described above is less than one percent (1%) of the value of the current liabilities before distribution; or

(3)     the value of the benefits payable under the Plan to an individual described above does not exceed $5,000.

(b)     For purposes of this Section, "Restricted Employee" means any Highly Compensated Employee or former Highly Compensated Employee. However a Highly Compensated Employee or former Highly Compensated Employee need not be treated as a "Restricted Employee" in the current year if the Highly Compensated Employee or former Highly Compensated Employee is not one of the twenty-five (25) (or larger number chosen by the Employer) non-excludable Employees and former Employees of the Employer with the largest amount of compensation in the current or any prior year.

. . .

(d)     A "Restricted Employee's" otherwise restricted benefit may be distributed in full to the affected individual if, prior to receipt of the restricted amount, the individual enters into a written agreement with the Administrator to secure repayment to the Plan of the restricted amount. The restricted amount is the excess of the amounts distributed to the individual (accumulated with reasonable interest) over the amounts that could have been distributed to the individual under the Straight Life Annuity described above (accumulated with reasonable interest). The individual may secure repayment of the restricted amount upon distribution by:

(1)     entering into an agreement for promptly depositing an escrow with an acceptable depository, property having a fair market value equal to at least one-hundred twenty-five percent (125%) of the restricted amount;

(2)     providing a bank letter of credit in an amount equal to at least one-hundred percent (100%) of the restricted amount; or

(3)     posting a bond equal to at least one-hundred percent (100%) of the restricted amount. The bond must be furnished by an insurance company, bonding company or other surety for federal bonds.

. . .

10

(f)     A surety or bank may release any liability on a bond or letter of credit in excess of one-hundred percent (100%) of the restricted amount.

(g)     If the Administrator certifies to the depository, surety or bank that the individual (or the individual's estate) is no longer obligated to repay any restricted amount, a depository may deliver to the individual any property held under an escrow agreement, and a surety or bank may release any liability on an individual's bond or letter of credit.

(Tr. Ex. 20).

There seems to be no dispute that Schaller is a Restricted Employee under the Plan, which is a category of beneficiaries reserved for the 25 most highly compensated employees of McDermott & Miller.  There also seems to be no dispute that at the time that Schaller made his first request for a lump-sum distribution on February 7, 2004, the Plan was underfunded.  The Plan clearly states, however, that when the Plan is underfunded, a Restricted Employee's right to elect certain methods of distribution is limited.

## Summary Judgment Standard

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Once a party has filed a motion for summary judgment, the burden shifts to the non-moving party to "go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'"  *Planned Parenthood of Minnesota/South Dakota v. Rounds,* 372 F.3d 969, 972 (8th Cir. 2004) (quoting *Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir. 1992)).  A dispute is genuine if the evidence is such that a reasonable trier of fact could return a decision in favor of the party opposing summary judgment.  *Id.*  In ruling on a motion for summary

11

judgment, a court must not weigh evidence or make credibility determinations.  *Kenney v. Swift Transp. Co.*, 347 F.3d 1041, 1044 (8th Cir. 2003).  Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate.  *Koehn v. Indian Hills Community College,* 371 F.3d 394, 396 (8th Cir. 2004).

### Analysis

The Defendants seek summary judgment on both of Schaller's claims. As to the first claim, the Defendants contend that the Plan Administrator's decision to deny Schaller's request for a lump-sum payment is not a denial of benefits under 29 U.S.C. §1132 as alleged in the Complaint's First Cause of Action.  The Defendants contend that Schaller will be paid the actuarial equivalent of the lump-sum distribution in periodic life annuity payments so long as the Plan is underfunded, and therefore, he has not been denied any benefits.

With regard to Schaller's second claim, the Defendants contend that the Plan Administrator properly executed the fiduciary duties that it owed to the Plan Participants and Beneficiaries in denying Schaller's request for a lump-sum payment.  Defendants argue that Schaller's breach-of-fiduciary-duty claim under 29 U.S.C. § 1104(a)(1)(A) and (D) should be dismissed, because the Plan Administrator's denial of the lump-sum distribution request was made to ensure the financial integrity of the already-underfunded Plan to secure the Plan's viability for the benefit of all the participants and future beneficiaries.

**Standard of Review for ERISA Claims**

The Plan reserves discretionary authority to the Plan administrator to determine eligibility and to construe the plan, and therefore, an abuse-of-discretion standard would ordinarily apply. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When considering a denial of benefits claim under an abuse-of-discretion standard, a plan administrator's interpretation will stand so long as it is reasonable. *King v. Hartford Life & Acc. Ins. Co.,* 414 F.3d 994, 999 (8th Cir. 2005) (en banc). In determining whether an administrator's interpretation of the Plan is reasonable, the Eighth Circuit Court has stated that courts should consider whether the interpretation "is inconsistent with the Plan's goals; whether it renders language of the plan meaningless, superfluous, or internally inconsistent; whether it conflicts with the substantive or procedural requirements of ERISA; whether it is inconsistent with prior interpretations of the same words; and whether it is contrary to the Plan's clear language." *Erven v. Blandin Paper Co.,* 473 F.3d 903, 906 (8th Cir. 2007)(citing *King*, 414 F.3d at 999; and *Finley v. Special Agents Mut. Benefit Ass'n, Inc.,* 957 F.2d 617, 621 (8th Cir. 1992)).

The abuse-of-discretion standard will be applied by this Court unless Schaller has presented "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [him]." *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998). The Eighth Circuit Court recently explained that in determining whether a plan administrator committed a procedural irregularity, courts will examine 1) whether the administrator labored under a conflict of interest, 2) whether the administrator acted

13

dishonestly or from an improper motive, or 3) whether the administrator's benefit decision "was made without reflection or judgment, such that it was 'the product of an arbitrary decision or the plan administrator's whim.'" *Johnson v. Metropolitan Life Ins. Co.*, 437 F.3d 809, 813 (8th Cir. 2006) *(quoting Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 838 (8th Cir. 2006) and *Buttram v. Cent. States, Southeast & Southwest Areas Health & Welfare Fund,* 76 F.3d 896, 900 (8th Cir. 1996)).

> The beneficiary must demonstrate not only procedural irregularities, but also that any such irregularities "caused a serious breach of the trustee's fiduciary duty to the plan beneficiary." *Id.* The irregularities "must have some connection to the substantive decision reached," such that they leave a reviewing court with "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim," or demonstrate that "the actual decision was reached without reflection and judgment." *Id.* at 900-01. Otherwise, a deferential standard of review is appropriate. *Id.*

*Neumann v. AT & T Communications, Inc.*, 376 F.3d 773, 781 -782 (8th Cir. 2004).

Schaller argues that the Court should apply the heightened standard of review because there is evidence of procedural irregularity, born of a conflict of interest. Schaller argues that the Defendants were in a palpable conflict of interest. He states that the shareholders' decision to reduce funding to the Plan operated to their personal financial advantage (and to his detriment) because it freed up more profit to apply to shareholder compensation. This provides some evidence of a palpable conflict of interest, but the Court concludes that this alone would be insufficient to warrant heightened review. *See Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1197 (8th Cir. 2002)( noting that "[n]ot every funding conflict of interest, however, warrants heightened review . . .because ERISA itself contemplates the use of fiduciaries who might not be entirely neutral.")

14

However, the Court finds that there is also compelling evidence of procedural irregularity in the Plan Administrator's refusal to consider Schaller's offer of the bank letter of credit as security for the lump sum payment.  The Plan Administrator's decision could be viewed as being made without reflection or judgment, and without proper investigation of Schaller's request.  *See Sahulka v. Lucent Technologies, Inc.*, 206 F.3d 763, 768 (8th Cir. 2000).   The Plan Administrator's decision can also fairly be viewed as being inconsistent with the Plan's goals of protecting the interests of the participants and beneficiaries and as inconsistent with the prior interpretations of the Plan provided by the Plan's Trustees, Plan Administrators, the actuary, and Employer.   This procedural irregularity is also causally related to the Plaintiff's claim that the lump sum payment has been wrongfully withheld in violation of Section 1104.   For these reasons, therefore, the Court concludes that a heightened standard of review should apply to the Administrator's decisions relative to Schaller's lump-sum distribution request.[3]

### Purposes of ERISA

The Court of Appeals for the Eighth Circuit has stated that "ERISA seeks to comprehensively regulate certain employee welfare benefits and pension plans and to protect the interests of participants in these plans by establishing standards of conduct, responsibility, and obligations for fiduciaries . . .."  *Johnston v. Paul Revere Life Ins. Co.* 241 F.3d 623, 628 (8th Cir. 2001)(citing  *Wilson v. Zoellner,* 114 F.3d 713, 715 (8th Cir.

---

[3] The Court finds that even under the abuse of discretion standard, there is a genuine issue of material fact regarding whether the Trustees and Plan Administrators acted arbitrarily and capriciously in refusing Schaller's request.  Thus, even under the more deferential standard, the Defendant's motion would be denied.

1997) and *Kuhl v. Lincoln National Health Plan of Kansas City, Inc.*, 999 F.2d 298, 301 (8th Cir.1993).  In addition, the Eighth Circuit Court has identified "the protection of individual pension rights" as the "primary purpose" of ERISA.  *See Harley v. Minnesota Min. and Mfg. Co.*, 284 F.3d 901, 907 (8th Cir. 2002), and *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir.1995) (both of which quoting H.R.Rep. No. 93-533, at 1 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4639).

**1.      Denial of Benefits under 29 U.S.C. § 1132**

Schaller asserts his first claim based on a denial of benefits under Section 1132. A civil action may be brought under § 1132(a)(1)(B), which  provides:

> A civil action may be brought – (1) by a participant or beneficiary – (B) to recover benefits due to him under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; . . . .

The Defendants argue that they have not denied Schaller any benefit to which he is entitled, and that the decision to deny the lump-sum distribution was well within the Plan Administrator's discretion. For these reasons, they seek summary judgment on this claim.

The Defendants argue that a Plan Administrator's refusal to pay a beneficiary in the manner or method preferred by the beneficiary is not a sufficient basis for a claim under Section §1132.  They contend that ERISA does not guarantee any specific method or mode of payment of benefit, and that a denial of a preferred method of distribution is not a denial of benefits under Section 1132, citing *Woolsey v. Marion Labs, Inc.* 934 F.2d 1452, 1457 (10th Cir. 1991) and *Pompano v. Schiavone & Sons, Inc.* , 680 F.2d 911, 916 (2nd Cir. 1982).  In support of their argument, the Defendants have offered the Affidavit of Gregg Rueschhoff, the actuary who has consulted with McDermott & Miller and the

individual Defendants about the Plan.  Rueschhoff has offered the opinion that the periodic payments being made to Schaller pursuant to the life annuity are the "actuarial equivalent" of the lump-sum payment that Schaller is seeking. (Filing No. 30, Walenz Affidavit at Ex. C).  The Defendants also argue that the power to refuse to distribute benefits in a lump sum is within the Plan Administrator's discretion and is not arbitrary and capricious.

Schaller argues that the value of the lump sum distribution is of far greater to him than is the value of periodic payments made pursuant to a life annuity.  He states that if he were to receive a life annuity and die after the first payment, the payments would end immediately, and for that reason, the benefits are not equivalent.  Schaller also objects to Rueschhoff's Affidavit on the basis that Rueschhoff's opinion on actuarial equivalents was not disclosed in the report that accompanied Defendants' Rule 26(a)(2) Disclosure of Experts made in January 2007. (Filing No. 33 at 13).  I agree that Rueschhoff's opinion regarding actuarial equivalents is not included in the report and was has not been properly disclosed.  There has been no motion for leave to supplement the report, and until such leave is granted, the Court will not consider the Affidavit.  Plaintiff's objection is sustained.

Nevertheless, I note that other courts that have considered the issue have held that when payments made pursuant to a life annuity are the actuarial equivalent to a lump-sum distribution, the beneficiary does not have an automatic claim for denial of benefits under 29 U.S.C. §1132.  The right to any particular method of payment must be found in the individual plans.  For example, in *Pompano v. Schiavone & Sons, Inc.*, 680 F.2d 911, 916 (2nd Cir. 1982), the United States Court of Appeals for the Second Circuit held that a pensioner had "no absolute right under the Plan to the specific mode of payment that he requested."  However, the *Pompano* Court found that the pensioner had notice that the

17

lump sum option was at the discretion of the committee, and that there was no evidence that the trustees were acting arbitrarily or in bad faith in denying the lump sum request, and there was no evidence that the trustees were acting in faith bad to confuse or mislead any Plan participants as to the lump sum distribution option.  *See also Oster v. Barco of Cal Employees' Ret. Plan,* 869 F.2d 1215 (9th Cir. 1989)(holding that denial of lump sum distribution was not arbitrary and capricious because the amount paid to the beneficiary was the actuarial equivalent, the administrator had reason to believe that a lump-sum disbursement would have an adverse effect on the Plan's stability, and the beneficiary had notice that the decision was a matte of the administrator's discretion.)  Those cases may be distinguished from this case, however, given that Schaller did not have clear notice that the lump sum distribution was in the sole discretion of the Plan Administrator, despite Schaller's attempts to investigate his options under the Plan.

The Defendants also argue that whether a Restricted Employee is entitled to a lump sum payment in the first instance is a matter within the Plan Administrator's discretion, and that the discretionary act of denying the lump sum request is not arbitrary or capricious. Defendants argue that the language of Section 5.20(d) uses "may" in multiple places, which indicates the discretionary nature of the Administrator's authority.  In addition, Defendants argue that the language of Section 5.20 requires the pensioner to "enter[ ] into a written agreement with the Administrator to secure repayment to the Plan of the restricted amount." Section 5.20(d).  Because nothing in the Plan requires that the Administrator enter into any such agreement with the pensioner, Defendants argue that whether to enter into the agreement is a matter left to the Administrator's sole discretion, and that the Administrator may exercise his discretion to refrain from entering into those agreements.

18

Schaller contends that the use of "may" does not vest the Administrator with discretion to deny the request, but rather bestows the right to make elections as between forms of benefit payments in the beneficiary, provided certain conditions are satisfied. Because the language of 5.20(d) is directed to the rights and responsibilities of the Restricted Employee rather than the rights and responsibilities of the Plan Administrator, I find that the use of "may" in Section §5.20(d) is ambiguous, and it could reasonably be interpreted to speak to the pensioner's election of a lump sum rather than a life annuity, and not to the Plan Administrator's discretionary authority.

In considering the Defendant's second argument, that the Plan Administrator has construed Section 5.20 as not requiring it to enter into a written agreement with the pensioner and thereby permitting it to refuse to exercise its discretion to distribute a lump-sum payment, the Court has found no Plan provision that expressly requires or precludes the Administrator to enter into written agreements referenced in Section 5.20(d). Yet, if the provision could be interpreted such that the Administrator is not obliged to exercise good faith in attempting to reach a written security agreement with Restricted Employees who elected a lump-sum distribution, then most of the language in Section 5.20 that follows subpart (d) would be superfluous.

The Court finds that the Plan Administrator's refusal to consider Schaller's offer of a bank letter of credit as security against the requested lump-sum distribution renders much of the language in Section 5.20 internally inconsistent. *See Erven,* 473 F.3d at 906. Such an effect indicates that the Plan Administrator's interpretation of the Plan provision is unreasonable.

19

The preceding observations accentuate the Defendants' failure to address Schaller's estoppel argument.  The Defendants argue that estoppel may only be used when the language of the plan under ERISA is ambiguous. Plan provisions are ambiguous if reasonable persons could disagree as to their meaning and effect. *Gruenke v. Miles, Inc. Welfare Plan,* 872 F. Supp. 652, 667 (D. Minn. 1995).  I conclude that Section 5.20 is ambiguous as it relates to the Administrator's authority to refuse to enter into a written agreement with a pensioner to provide security for the restricted benefits payable in a lump sum.  Schaller argues that the Defendants should be estopped from denying the lump-sum benefits, and he should be permitted to present evidence at trial of statements and actions of the Plan fiduciaries that led Schaller to believe and rely upon the fact that he was entitled to and would be receiving a lump sum distribution, provided only that he could obtain the necessary security as stated in the Plan at Section 5.20(d).

Defendants counter that it was not reasonable for Schaller to rely upon those statements, some of which were made more than six months prior to his retirement date. However, the Plan fiduciaries' communications were intended to inform Schaller about the provision of the Plan that has some ambiguity, and they were requested by Schaller in an attempt to understand his rights to a lump-sum distribution upon retirement.  Therefore, the Court concludes that Schaller is entitled to consideration of his estoppel argument by the finder of fact.  *See Slice v. Sons of Norway,* 34 F.3d 630 , 634 (8th Cir. 1994)(noting that estoppel may be appropriate in circumstance when the terms of the plan are ambiguous and the communications constituted an interpreation of that ambiguity.")

I find that  genuine issues of material fact remain, at a minimum with regard to 1) whether the lump-sum distribution is equivalent in value to the periodic payments Schaller

20

is receiving or will receive pursuant to the life annuity, and 2) whether Plan fiduciaries in their statements and conduct misled Schaller into reasonably believing that he would be paid a lump sum upon retirement and whether Schaller in fact reasonably relied on those alleged misrepresentations to his detriment in electing to retire on February 7, 2004.  For these reasons, the Court concludes that the Defendants are not entitled to summary judgment on the claim based on an alleged denial of benefits.

## II.     Breach of Fiduciary Duty under Section 1104.

The ERISA fiduciary standard is set forth in 29 U.S.C. § 1104(a)(1)(B)(C) and (D), the relevant portions include:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting an a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;  .   .    .        [and]
> >
> > (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this subchapter.

ERISA's civil enforcement provision, found in section 1132, lists six types of civil actions that may be pursued for violations of the statute. Section 1132(a)(3), allows a civil action, "by a participant, beneficiary, or fiduciary ... (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of . . .  the terms of the plan." 29 U.S.C. § 1132(a)(3)(B). This provision allows an individual plan beneficiary to seek equitable remedies for breach of fiduciary duty in his individual capacity.  *See Varity Corp. v. Howe*, 516 U.S. 489, 510-13, 515  (1996) (finding section 1132(a)(3) allows

21

individual actions for equitable relief for breaches of fiduciary duty).  Recovery is limited, however, to "classic" equitable remedies, "such as injunctive, restitutionary, or mandamus relief, and does not extend to compensatory damages." *Knieriem v. Group Health Plan, Inc.* 434 F.3d 1058, 1061 (8th Cir. 2006) (*quoting Mertens v. Hewitt Associates*, 508 U.S. 248, 257-58 (1994) and *Kerr v. Charles F. Vatterott & Co.,* 184 F.3d 938, 943 (8th Cir. 1999))

> At least one court in this Circuit has set forth the elements of the claim as follows:
>
> To establish a claim for breach of fiduciary duty under ERISA based on alleged misrepresentations regarding the terms of an employee benefit plan, a plaintiff must show 1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; 2) that these constituted material misrepresentations; and 3) that the plaintiff relied on those misrepresentations to their detriment.

*Martino-Catt v. E.I. duPont Nemours and Co.,* 317 F.Supp.2d 914, 927 (S.D.Iowa 2004), citing *James v. Pirelli Armstrong Tire Corp.,* 305 F.3d 439, 449 (6th Cir. 2002).

The Plan fiduciaries' communications to Schaller before his retirement went to the crux of this case – Schaller was attempting to determine what kind of payout he was entitled to receive upon his retirement and in what amount.  The Court concludes that there are genuine issues of fact regarding whether the representations made by the fiduciaries were in fact false when they were made or known to be false thereafter and before Schaller's retirement.  If so, then there is a genuine issue as to whether the fiduciaries satisfied their duty to disclose information to Schaller related to the Plan Administrator's interpretation of the Plan or proposed amendments to the Plan before February 7, 2004.  Under the common law, a fiduciary's duty to disclose was generally triggered by a specific request from a beneficiary. See Restatement (Second) of Trusts § 173.  In this case,

Schaller made the specific request several months before he decided to retire. "The duty of disclosure under ERISA has been described as "an area of developing and controversial law." *In re Enron*, 284 F.Supp.2d 511, 555 (S.D.Tex. 2003). For example, it has been held that once one who is acting in a fiduciary capacity endeavors to discuss the plan, he may "not affirmatively miscommunicate or mislead plan participants about material matters regarding their ERISA plan." *Id. See also Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) (noting that "lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1)....").

The Court finds that there are genuine issues of material fact relating to whether the Plan Administrators and others Defendants have breached fiduciary duties they owned to Schaller. There is an issue of whether the Plan Administrator's refusal to consider a lump-sum distribution in Schaller's favor, given Schaller's stated ability to provide a bank letter of credit and based on the Plan fiduciaries' prior statements to Schaller regarding his ability to elect a lump-sum distribution, was a breach of fiduciary duty. There is also an issue as to whether the Plan Administrator breached its duty, as measured against the prudent man standard, in disclosing material facts to Schaller before he retired. The only explanation for the Plan Administrator's refusal to make the lump-sum distribution was that it was acting in the interest of maintaining the financial integrity of the underfunded Plan for the benefit of all the participants and beneficiaries. Yet, the Plan's provisions in Section 5.20(d) require Restricted Employees to provide security before payouts of the restricted amount, presumably to protect the very same interest.

23

Because I find that there are genuine issues of fact regarding whether the Defendants breached fiduciary duties to Schaller, the Defendants' motion for summary judgment will be denied as to that claim.  For all these reasons,

IT IS ORDERED:

1.    The Affidavit of Gregg Rueschhoff at Filing No. 30 is hereby stricken from the record; and

2.    Defendant's Motion for Summary Judgment (Filing No. 31) is denied in all respects.

DATED this 26th day of June, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge